FILED
2019 Feb-08 PM 05:19
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| THE ALABAMA STATE CONFERENCE OF THE NAACP, ERIC CALHOUN and JENNIFER FORD, | ) ) ) ) ) | CASE NO. 2:18-cv-02056-LSC |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| CITY OF PLEASANT GROVE, et al., | ) ) ) | |
| Defendants. | ) ) | |

---

## BRIEF IN SUPPORT OF MOTION TO DISMISS
## OF DEFENDANTS CITY OF PLEASANT GROVE,
## MAYOR JERRY BRASSEALE, WILLIAM BULLION,
## JAMES CRUMPTON, KENNETH HATFIELD, PHILIP HOUSTON
## AND PAULA JOHNSON

---

**David J. Canupp**
**J. Brad Emmons**
**Lanier Ford Shaver & Payne PC**
**2101W. Clinton Avenue, Ste. 102**
**Huntsville, AL 35805**
**(256) 535-1100**

*Attorneys for Defendants City of Pleasant Grove, Mayor Jerry Brasseale,*
*William Bullion, James Crumpton, Kenneth Hatfield, Philip Houston*
*and Paula Johnson*

## <u>TABLE OF CONTENTS</u>

I.  Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   A.   Plaintiffs' Claims Under the Voting Rights Act Must be
        Dismissed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        i.   Section 2 Claims Brought by Plaintiffs Who Constitute a
             Majority of a City's Total Population, Voting-Age
             Population, and Registered-Voter Population Are Not
             Cognizable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        ii.  Plaintiffs Have Failed to Plausibly Allege That the City's
             Electoral Practices Have a Discriminatory Effect on Black
             Voters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   B.   Plaintiffs' Constitutional Claims Are Due to be Dismissed. . . . . . . . 30

        i.   Plaintiffs' Fifteenth Amendment Claims. . . . . . . . . . . . . . . . . 30

        ii.  Plaintiffs' Fourteenth Amendment Claims. . . . . . . . . . . . . . . . 31

   C.   The Official-Capacity Defendants Are Due To Be Dismissed. . . . . 34

        i.   Claims Against the Official-Capacity Defendants Must Be
             Dismissed as Needlessly Duplicative. . . . . . . . . . . . . . . . . . . . 34

        ii.  The Official-Capacity Defendants Are Absolutely Immune
             from Any Constitutional Claims. . . . . . . . . . . . . . . . . . . . . . . 36

IV.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

i

Defendants City of Pleasant Grove, Mayor Jerry Brasseale, William Bullion, James Crumpton, Kenneth Hatfield, Philip Houston, and Paula Johnson respectfully submit the following brief in support of their motion to dismiss all claims raised against them in the complaint filed by Plaintiffs Alabama State Conference of the NAACP (the "Alabama NAACP"), Eric Calhoun, and Jennifer Ford:

## I.   Introduction

The fulcrum question raised by Plaintiffs' complaint is whether the City of Pleasant Grove's use of the State of Alabama's default, at-large system for electing City Council members violates the Voting Rights Act by diluting the votes of black residents in the specific context of Pleasant Grove's unique demographics. (Doc. 1 ¶¶ 16-19, 57-58). The answer is that the use of this default system simply is not illegal or unconstitutional under such circumstances. To be sure, courts have at times found at-large elections can dilute the votes of a racial minority group within a community by concentrating the voting power of the racial majority group across the geographic expanse of the polity. Contrary to the allegations of the complaint (id. at ¶ 15), however, this case is ***brought*** by a racial majority group. According to the latest census and voter registration data — both of which are susceptible to judicial notice and may be considered on a motion to dismiss — black residents actually constitute a majority of the City's population, a majority of the City's voting-age population,

1

*and* a majority of the City's registered voters. The complaint includes no explanation whatsoever, much less a plausible explanation, as to how continued use of the current system will dilute the votes of black residents in future elections in which blacks form a majority of the voting population.

Instead, the complaint relies upon purely conclusory statements of law to justify its submission that the City's election system has the result of denying or abridging the voting rights of the City's black residents. (Id. at ¶¶ 25-28). However, the complaint's raw conclusions cannot be accepted. To state a viable Section 2 claim, Plaintiffs must allege sufficient factual matter, accepted as true, to establish each of the Gingles preconditions to a Section 2 claim *and* to establish the existence of vote dilution under the totality of the circumstances. See Thornburg v. Gingles, 478 U.S. 30, 46 (1986); Lowery v. Deal, 850 F. Supp. 2d 1326, 1330 n.1 (N.D. Ga. 2012). The Gingles factors were designed to protect against racial discrimination that results from the "numerical superiority" of another race. Id. at 48. Record evidence in this case shows black residents actually now form a majority of the total population, voting-eligible population, and registered voters in Pleasant Grove, and the complaint includes no specific allegations of minority political cohesion, majority bloc voting, or overt efforts to diminish the voting strength of the City's black

2

residents. Because Plaintiffs have therefore failed to adequately plead facts to satisfy *any* of the Gingles factors, their Section 2 claims are due to be dismissed in full.

In addition, Plaintiffs' claims under the Fourteenth and Fifteenth Amendments must be dismissed. First, because "[S]ection 2 was intended to be more permissive than the constitutional standard," a plaintiff who has failed to establish a Section 2 violation cannot state a Fourteenth Amendment vote-dilution claim. See Johnson v. DeSoto Cty. Bd. of Comm'rs, 204 F.3d 1335, 1344 (11th Cir. 2000) ("[W]e doubt that any plaintiff, challenging an electoral system like DeSoto County's, can establish a constitutional vote dilution claim where his section 2 claim has failed."); Georgia State Conference of NAACP v. State, 269 F. Supp. 3d 1266, 1281 (N.D. Ga. 2017) ("[I]f the Gingles preconditions cannot be shown, neither can the causation requirement necessary for a Fourteenth Amendment claim under the law of this circuit."). Second, neither the Eleventh Circuit nor the Supreme Court has ever "held or even suggested that vote dilution violates the Fifteenth Amendment." Osburn v. Cox, 369 F.3d 1283, 1288 (11th Cir. 2004).

Finally, the claims raised in the complaint against Pleasant Grove's individual councilpersons and mayor in their official capacities are improper, duplicative of the claims against the City, and barred in part by legislative immunity. E.g., Perez-Santiago v. Volusia County, 2009 WL 2602461, at *2 (M.D. Fla. Aug. 25, 2009).

## II.   Factual Background

The City of Pleasant Grove (the "City") is located in Jefferson County, Alabama. (Doc. 1 ¶ 12). With a population of just over 10,000 inhabitants, the City operates under a mayor-council system (see Doc. 1 ¶¶ 15-16), which is the standard form of government for Alabama municipalities of its size. See Ala. Code § 11-43-2(b).[1] In their complaint, Plaintiffs allege that the City's numbered-place, at-large system for electing City Council members pursuant to Alabama law violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, in that this system has the purpose or effect of diluting the strength of black voters or abridging their right to participate in the political process. (Id. ¶¶ 57-58). Plaintiffs further claim, pursuant to 42 U.S.C. § 1983, that the City's current electoral system violates the Fourteenth and Fifteenth Amendments of the United States Constitution in that this system is purportedly intended to dilute the voting strength of black voters. (Id. ¶ 58).

For municipalities operating under a mayor-council form of government, Alabama law provides that any municipality that does not affirmatively elect to provide for single-member districts will operate, by default, on some form of at-large

---

[1]Although Plaintiffs cite to Ala. Code § 11-43A-32 at one point (Doc. ¶ 17), that statute applies only to municipalities operating a *council-manager form* of government. See Ala. Code § 11-43A-1, *et seq.* Despite this citation, Plaintiffs appear to concede that the City has *not* adopted a council-manager system form of government and thus continues to operate under a mayor-council system. (See Doc. 1 ¶ 14) (citing Ala. Code § 11-43-2).

election system for city council positions. See Ala. Code § 11-43-2(d). Because the City has never affirmatively adopted a single-member district system, it continues to choose the members of its City Council through at-large elections as required by the default provisions of Ala. Code § 11-43-2(d). (See Doc. 1 ¶ 16).[2]

The City presently conducts its at-large City Council elections pursuant to a numbered-place system, in compliance with Ala. Code § 17-6-33. (Id. ¶ 17). Since at least 1961, the numbered-place system has been the primary form of at-large elections in Alabama municipalities. See Ala. Code § 17-6-33 (codifying Act 221 § 1, 1961 Ala. Acts 2234, 2234-35). As the Eleventh Circuit has explained:

> A numbered place requirement forces candidates for multimember offices . . . to run for a particular seat, rather than for any existing vacancy. Each seat is given a designated place on the ballot (group 1, 2, 3, and so forth) so that all of the candidates are not competing against one another. The effect of a numbered place system is therefore to break what would otherwise be a single contest into several mini-elections.

Nipper v. Smith, 39 F.3d 1494, 1499 & n.4 (11th Cir. 1994). Contrary to the allegations of law contained within the complaint, such numbered-place at-large elections in Alabama are not *per se* violative of the Voting Rights Act. See, e.g.,

---

[2] Municipalities are afforded the discretion under State law to pass an ordinance adopting single-member districts. (See Doc. ¶¶ 13-14); see also Ala. Code §§ 11-43-2(d), 11-43-63. However, municipalities in Alabama are not required to adopt a single-member district system. See, e.g., Ala. Code § 11-43-63 (noting that a municipality "*may* . . . by ordinance adopted by a majority of the membership of the council, divide the municipality into single-member districts (wards)") (emphasis supplied).

<u>Southern Christian Leadership Conference of Ala. v. Evans</u>, 785 F. Supp. 1469, 1487-89 & nn.3-4 (M.D. Ala. 1992) (noting federal government's concession that "the institution of the at-large, numbered place system was not driven by any desire to dilute black voting strength," concluding that Alabama's numbered-place judicial elections had no discriminatory purpose, and finding it "extremely questionable" that § 17-6-33 "had any racial motivation in any election"), *aff'd*, 56 F.3d 1281 (11th Cir. 1995).

In support of their claims, Plaintiffs highlight little in the way of specific indicia of present-day vote dilution. The only particularized modern-day allegations of any relevance that appear in the complaint are that (1) City elections are subject to a majority-vote requirement, as required by Ala. Code § 11-46-55 (<u>id</u>. ¶ 41); (2) the City has not yet elected any black City Council members (<u>id</u>. ¶¶ 21, 40); and (3) black candidates lost City Council elections in the 2008 and 2016 election cycles. (<u>Id</u>. ¶¶ 29-31).[3]

Beyond those allegations, however, Plaintiffs do not recite any specific, up-to-date facts—such as voting-age population statistics, voter registration numbers, voter participation numbers, the demographic breakdown of electoral outcomes, or other

---

[3]   The City's mayor is also elected at-large pursuant to State law. Ala. Code § 11-43-2(a). Though Plaintiffs assert that black candidates also ran for mayor in both cycles and lost to the incumbent (Doc. 1 ¶¶ 30-31), they do not challenge the City's at-large mayoral races.

relevant facts or figures—suggesting that the votes of black City residents will be diluted in upcoming elections. Instead, Plaintiffs rely in large part on naked assertions, devoid of further factual enhancement, that the City's black voters are a part of a minority group that is "politically cohesive," that the City's white voters currently engage in "bloc voting," and that majority-black voting districts could be created if the City were to adopt single-member districts. (Id. ¶¶ 27-29).

Lacking any other relevant facts concerning the City's adherence to the default system of municipal elections under Alabama law, Plaintiffs seek to bolster their claims by pointing to 1980s-era litigation against the City under Section 5 of the Voting Rights Act, which is not implicated here.[4] (Id. ¶¶ 34-35). Plaintiffs note that a three-judge panel in the mid-1980s, affirmed by the Supreme Court, reached findings and conclusions concerning the City's housing, zoning, employment, and annexation policies from the 1940s to 1985. (See id. ¶ 34). However, Plaintiffs cite no findings from that litigation concerning the City's numbered-place at-large municipal elections. (See id.). Nor do Plaintiffs cite any facts concerning the City's policies or practices in the three-and-a-half decades *since*, aside from noting that the

---

[4] In 2013, the Supreme Court held that the coverage formula under Section 4 of the Voting Rights Act, which governs the application of Section 5, was unconstitutional. See Shelby County, Ala. v. Holder, 570 U.S. 529 (2013). The effect of this decision was to "stop[] any application of § 5." See id. at 587 (Ginsburg, J., dissenting).

City continues to comply with Alabama's numbered-place statute and majority-vote requirement. (See id. ¶¶ 34, 41). Though Plaintiffs also cite several other court cases to which neither Plaintiffs nor Defendants were parties, those actions did not involve City policies or practices. (See id. ¶¶ 37-39).

More broadly, the complaint mischaracterizes the present demographics of Pleasant Grove. Citing nine-year-old Census data, the complaint argues that 53.7% of the City's residents are white, and 44.8% of the residents are black. (Doc. 1, at ¶ 15). However, the City of Pleasant Grove has seen substantial demographic changes over the past four decades, and especially dramatic changes since the 2010 Census. Before 1983 — when much of the case law referenced by Plaintiffs developed — the City's population of 7,086 people was entirely white with the exception of a handful of black nursing home residents. See City of Pleasant Grove v. United States, 568 F. Supp. 1455, 1456 n.3 (D.D.C. 1983). By 1990, 152 of the City's 8,458 residents (about 1.8%) were black. See U.S. Dep't of Commerce, Economics & Statistics Admin., Bureau of the Census, 1990 Census of Population: General Population Characteristics: Alabama 39 (1992), *available at* https://www2.census.gov/library/publications/decennial/1990/cp-1/cp-1-2.pdf.[5] Ten years later,

---

[5] Because Census information is an adjudicative fact, the Court may take judicial notice of these and other public records from the U.S. Census Bureau without converting the instant motion to a motion for summary judgment. See Solomon v. Liberty County, Fla., 957 F. Supp. 1522, 1556

8

the City's black population had increased to 1,142, or 11.4% of the City's 9,983 residents. See U.S. Dep't of Commerce, Economics & Statistics Admin., Bureau of the Census, 2000 Census of Population and Housing: Alabama: 2000: Summary Population and Housing Characteristics 60 (June 2002), https://www.census.gov/prod/cen2000/phc-1-2.pdf. By 2010, although the City's overall population had grown almost imperceptibly to 10,110 over the previous decade, the black population had almost quadrupled to 4,534 residents, or almost 45% of the City's inhabitants. (Doc. 1 ¶ 15). See also U.S. Dep't of Commerce, Economics & Statistics Admin., Bureau of the Census, 2010 Census of Population and Housing: Alabama: 2010: Summary Population and Housing Characteristics 112 (Dec. 2012), ftp://ftp2.census.gov/library/publications/2012/dec/cph-1-2.pdf.

While the complaint in this case focuses on the 2010 Census, five-year running data from the U.S. Census Bureau's American Community Survey ("ACS") for the

---

n.78 (N.D. Fla. 1997) (citing Hollis v. Davis, 941 F.2d 1471, 1474 (11th Cir. 1991)) ("[C]ensus data is an adjudicative fact within the scope of Federal Rule of Evidence 201(b)."); see also Universal Express, Inc. v. U.S. SEC, 177 F. App'x 52, 53 (11th Cir. 2006) ("A district court may take judicial notice of [public records] without converting a motion to dismiss into a motion for summary judgment."); Whitaker v. Miami-Dade County, 126 F. Supp. 3d 1313, 1322 nn.3-5 (S.D. Fla. Feb. 20, 2015) (holding that judicial notice of Census data does not require conversion of a motion to dismiss into a motion for summary judgment); ACLU v. Martinez-Rivera, 166 F. Supp. 3d 779, 791 (W.D. Tex. 2015) (quotations omitted) (taking judicial notice without converting motion to dismiss to one for summary judgment, because "United States census data is an appropriate and frequent subject of judicial notice"); 5B Wright & Miller, Fed. Prac. & Proc. Civ. § 1357, n.1 & accompanying text (3d ed., Nov. 2018 update) ("[M]atters of public record . . . may be considered by the district judge without converting the motion into one for summary judgment. *These matters are deemed to be a part of every complaint by implication.*") (emphasis supplied).

years 2013-2017 show that the City's racial demographics have continued to shift over the past decade.[6] Out of an estimated 10,224 residents currently living in Pleasant Grove, 5,658 (55.3%) are black or African American alone or in combination with one or more other races. (See **Exhibit 1**, 2013-2017 ACS 5-Year Estimates, Report Nos. B01001, B01001A, B01001B, and DP05).[7] ACS data show

---

[6] "[T]here is a presumption that . . . the Census Bureau's ACS voting-eligible population estimates . . . are accurate and involve reliable statistical techniques." Bellitto v. Snipes, 302 F. Supp. 3d 1335, 1350 (S.D. Fla. 2017) (citing Johnson v. DeSoto Cnty. Bd. of Comm'rs, 204 F.3d 1335, 1341-42 (11th Cir. 2000)); see also Johnson, 204 F.3d at 1341 ("The presumption is that census figures are continually accurate."); Rios-Andino v. Orange County, 51 F. Supp. 3d 1215, 1224 (M.D. Fla. 2014) (observing that "the five-year [ACS] estimates are reliable for communities of any size—all the way down to the 'census tract' and 'block group' level"). Moreover, Census data, including ACS data, constitute public records that are subject to judicial notice without converting a motion to dismiss into a motion for summary judgment. See Wilson v. Ill. Cent. R. Co., 2012 WL 135446, at *3 (N.D. Ill. Jan. 12, 2012) (citing League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 438 (2006), Toj–Culpatan v. Holder, 612 F.3d 1088, 1091 n. 3 (9th Cir.2010), Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections, 2011 WL 6318960, at *20 (N.D. Ill. Dec.15, 2011), Cent. Ala. Fair Horn. Ctr. v. Magee, 2011 WL 6182334, at *17 n.18 (M.D. Ala. Dec. 12, 2011), Rivera v. Inc. Vill. of Farmingdale, 784 F. Supp. 2d 133, 144 n.6 (E.D.N.Y. 2011), and Benavidez v. City of Irving, Tex., 638 F. Supp. 2d 709, 714–15, 721 (N.D. Tex.2009)) (taking judicial notice of ACS data); see also, e.g., United States v. Dreyer, 767 F.3d 826, 834 n.12 (9th Cir. 2014) (same), reh'g en banc granted, 782 F.3d 416 (9th Cir. 2015), and rev'd in part on other grounds, 804 F.3d 1266 (9th Cir. 2015); Perez v. Perry, 2017 WL 962686, at *1 (W.D. Tex. Mar. 10, 2017) (same); Chabad Lubavitch v. Borough of Litchfield, Conn., 213 F. Supp. 3d 329, 339 n.9 (D. Conn. 2016) (same); cf., Whitaker, 126 F. Supp. 3d at 1322 nn.3-5; Giron v. City of Alexander, 693 F. Supp. 2d 904, 930-31 (E.D. Ark. 2010) (taking judicial notice of interim Census data "in that it is 'not subject to reasonable dispute' because it is 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'").

[7] The Court may readily access the ACS information found in Exhibit 1 by visiting the Census Bureau's American FactFinder Advanced Search page, https://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml, and searching for the cited report numbers from the "2017 ACS 5-year estimates" while limiting the geography to "Pleasant Grove city, Alabama: Place within State."

that of the City's approximately 7,765 voting-age residents, at least 3,966 (51.1%) are black or African American. (See id.).

The most recent changes in the City's demographics are also reflected in the City's voter registration numbers. As of January 2019, black and African American registered voters constitute 3,703 (53.1%) out of the City's 6,964 registered voters. (See **Exhibit 2**, certified Pleasant Grove voter registration statistics).[8] In short, whether one considers the City's total population, voting-age population, or voter registration numbers, the available public records demonstrate that black residents are in the majority. In addition, the complaint includes no allegations whatsoever of overt methods of discouraging or decreasing the black vote. Likewise, aside from these numbered-place at-large elections, Plaintiffs do not allege any other current City policies or practices that have the purpose or effect of diluting or otherwise abrogating the rights of black residents to vote. Nor do Plaintiffs give any explanation for why they waited to file this lawsuit until nine years after the 2010 Census, and just on the eve of the 2020 Census.

---

[8] Exhibit 2 is certified and authenticated pursuant to Federal Rule of Evidence 902(1). Certified copies of voter registration statistics from the appropriate registration authority are a public record subject to judicial notice, as such information constitutes an adjudicative fact that can accurately and readily be determined from a source whose accuracy cannot reasonably be questioned. See, e.g., Hall v. Louisiana, 2015 WL 1383532, at *3 (M.D. La. Mar. 23, 2015) (holding that such information "falls within the ambit of Rule 201"); cf., e.g., Danzie v. Norris, 2009 WL 1529459, at *14 n.28 (E.D. Ark. June 1, 2009) (taking judicial notice of population and voter registration figures).

### III.   Argument

When reviewing a motion to dismiss, the Court must take the factual allegations of the complaint as true and must construe those allegations in the light most favorable to the plaintiffs. E.g., Echols v. Lawton, ___ F.3d ___, No. 17-13843, 2019 WL 324550, at *2 (11th Cir. Jan. 25, 2019). However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). This "plausibility standard" applies to "all of Plaintiffs' claims," including those claims brought under the Voting Rights Act. See, e.g., Lowery v. Deal, 850 F. Supp. 2d 1326, 1330 n.1 (N.D. Ga. 2012).

Under this standard, "'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice to state a claim for relief. See Iqbal, 556 U.S. at 678. Further, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.; see also Am. Dental Assoc. v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (instructing courts to "eliminate any allegations in the complaint that are merely legal conclusions"). "[U]nwarranted deductions of fact in a complaint are [also] not admitted as true." Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (quotation omitted); see also Iqbal, 556 U.S. at 679 (conclusory allegations are "not entitled to be assumed true"). While

12

the Court must make reasonable inferences in Plaintiffs' favor, it is not required to draw Plaintiffs' inferences. See Sinaltrainal, 578 F.3d at 1260.

In sum, a pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level" in order to survive a motion to dismiss. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quotation omitted).

### A.   Plaintiffs' Claims Under the Voting Rights Act Must be Dismissed

Section 2 of the Voting Rights Act, 52 U.S.C. § 13101, "prohibits any State or political subdivision from imposing any electoral practice which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." Perry v. Perez, 565 U.S. 388, 391 n.1 (2012) (quotation omitted). A Section 2 violation is established

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a racial minority group] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 13101(b).

13

A so-called "vote dilution" claim may be brought under Section 2 where a State or political subdivision imposes "election methods that dilute the voting strength of racial minority voters in the larger voting population." Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 775 F.3d 1336, 1339 n.3 (11th Cir. 2015). The Supreme Court has explained that "the theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, *by virtue of its numerical superiority*, will regularly defeat the choices of minority voters." Thornburg v. Gingles, 478 U.S. 30, 48 (1986) (emphasis supplied). In the very next breath, the Supreme Court emphasized that at-large elections, such as the City's elections for council members, do not inherently violate Section 2. See id.; see also, e.g., U.S. v. Marengo County Comm'n, 731 F.2d 1546, 1564 (11th Cir. 1984) ("[A]t-large elections are not prohibited per se . . . ."). In particular, it is clear that a court may not conclude that vote dilution has occurred just because an Alabama political subdivision operates a numbered-place at-large electoral system. See, e.g., Southern Christian Leadership Conference of Alabama v. Sessions, 56 Fd.3d 1281, 1292-94 (11th Cir. 1995). Instead, "minority voters who contend that the multimember form of districting violates § 2, must prove that the use of a multimember electoral structure operates to minimize or cancel out their ability to

14

elect their preferred candidates." Gingles, 478 U.S. at 48; see also Ga. State Conf.,

775 F.3d at 1339 n.3.

In Gingles, the Supreme Court announced three "necessary preconditions,

intended to help courts determine which claims could meet the totality-of-the-

circumstances standard for a § 2 violation." Ga. State Conf., 775 F.3d. at 1342 (citing

478 U.S. at 49-51) (citation omitted). Those three "threshold requirements" to a

Section 2 vote dilution claim require a showing that:

> (1) the minority group is "sufficiently large and geographically compact
> to constitute a majority in a single-member [voting] district"; (2) the
> minority group is "politically cohesive," and (3) that the "majority votes
> sufficiently as a bloc to enable it ... usually to defeat the minority's
> preferred candidate."

Id. (quoting Gingles, 478 U.S. at 49-51) (alterations in the original). Only *after*

Plaintiffs satisfy these three Gingles preconditions may the Court then proceed to

determine whether the totality of the circumstances demonstrate the existence of vote

dilution. See id.; see also Bartlett v. Strickland, 556 U.S. 1, 11-12 (2009).

Here, the Section 2 claims asserted against the City must be dismissed in their

entirety. Such claims are not viable where, as here, the Plaintiffs are among the

majority of a political subdivision's total population, voting-age population, and

registered voters. This is especially true where, as here, Plaintiffs have failed to plead

sufficient factual material to plausibly show that the three mandatory <u>Gingles</u> preconditions to a Section 2 vote dilution claim are satisfied.

### i.  Section 2 Claims Brought by Plaintiffs Who Constitute a Majority of a City's Total Population, Voting-Age Population, and Registered-Voter Population Are Not Cognizable

It is clear from both the statutory text of the Voting Rights Act and Supreme Court jurisprudence that in order to state a viable Section 2 claim, a plaintiff must be a member of a racial or ethnic group that in some way comprises a minority share of the political subdivision's relevant population. In this action, public records establish that the City's black residents comprise a *majority* of the City's total population, voting-age population, and registered-voter population. (Exhibits 1 & 2). Accordingly, Plaintiffs' claims of vote dilution are not cognizable and are due to be dismissed without further discussion.

Section 2 provides that a city may not impose any standard, practice, or procedure that results in the denial or abridgement of a person's right to vote "on account of race or color." 52 U.S.C. § 13101(a). Section 2 goes on to refer to "members of a *protected class*," meaning "members of a class of citizens protected by" the preceding subsection. 52 U.S.C. § 13101(b). In other words, Section 2's use

16

of the term "protected class" refers to those persons whose right to vote is protected from denial or abridgement "on account of race or color." See 52 U.S.C. § 13101.

In construing analogous language in Title VII, which also prohibits discrimination "because of [an] individual's race[ or] color," see 42 U.S.C. § 2000e-2, the Eleventh Circuit has recognized that the term "protected class" refers to persons protected from discrimination on the basis of *racial classification*, regardless of their specific race. See, e.g., Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1325 & n.15 (11th Cir. 2011) (acknowledging that white employee was "member of a protected class" under Title VII and that "[d]iscrimination is discrimination no matter what the race"). Thus, the words "protected class" should not be understood simply to refer to members of nationwide or historical racial minority groups, but instead refer to persons who are protected against discrimination on the basis of racial classification *under the specific circumstances contemplated by the statute in question*. Cf., id.

The Supreme Court has provided crucial guidance as to the specific circumstances in which a person belongs to a "protected class" for Section 2 purposes. In Thornburg v. Gingles, 478 U.S. 30, 46 (1986), the Court recognized that a Section 2 vote dilution claim is necessarily predicated upon a racial or ethnic group's minority voting strength. As noted above, the Court held that the "[t]he theoretical basis for" a vote dilution claim "is that where minority and majority voters

17

consistently prefer different candidates, ***the majority, by virtue of its numerical superiority***, will regularly defeat the choices of minority voters" through the use of "a certain electoral law, practice, or structure." Gingles, 478 U.S. at 48 (emphasis supplied). Thus, the "protected class" under Section 2 includes members of a racial or ethnic population that lack sufficient "numerical superiority" *in the relevant political subdivision* to elect their preferred candidates. See id.

The Supreme Court's "numerical superiority" holding reflects a marked change from earlier decisions concluding that a majority share of a city's total population, *standing alone*, could not automatically foreclose a Section 2 vote dilution claim. In Zimmer v. McKeithen, 485 F.2d 1297, 1300, 1303-04 (5th Cir. 1973), for example, the former Fifth Circuit had held that the applicable legal standards under Section 2 "admit of no distinction on the basis of *size of population alone*." Zimmer, 485 F.2d at 1300, 1303-04 (emphasis supplied). Relying on this now-outdated principle, the Zimmer panel reversed the trial court's dismissal of a Section 5 claim where black residents comprised "a majority of the total population" of the parish, but only "a minority of registered voters." See id. at 1306.[9] However, both prior to and since the

---

[9] Similarly, U.S. v. Marengo County Comm'n, 731 F.2d 1546 (11th Cir. 1984) — another pre-Gingles case — involved black voters who were a majority of the population but a *minority* of registered voters. Id. at 1550. That case also involved a county affected by illegal polling practices that impaired the ability of blacks to register and participate in the electoral process. Id. at 1574. In contrast, there are no allegations of ongoing, overt voter suppression in this action, and black voters in the City actually do form a majority of *registered* voters as well as a majority of the population.

Gingles Court's "numerical superiority" holding, the Eleventh Circuit has *never* found vote dilution where a racial or ethnic group , as here, comprises a majority share of the political subdivision's total population, voting age population, *and* registered voter population.[10]

If anything, the Eleventh Circuit's decisions since Gingles reinforce that a Section 2 plaintiff *must* establish that she is a member of a racial or ethnic group that lacks some degree of "numerical superiority" in the political subdivision's electoral processes. In Meek v. Metro. Dade County, 908 F.2d 1540 (11th Cir. 1990), the Eleventh Circuit permitted a vote dilution claim by the Hispanic plaintiffs to proceed only after finding that Hispanics constituted a *minority* political force when compared to a *majority* bloc of hostile white and black voters that collectively comprised a numerically larger population group. See id. at 1546-47. Moreover, on remand, the trial court held that Hispanic residents' votes were diluted, in part because "Hispanics *are not a majority* of the [county's] registered voters," and the Eleventh Circuit affirmed. See Meek v. Metro. Dade County, 805 F. Supp. 967, 988 (S.D. Fla. 1992),

---

[10]In the Eleventh Circuit's 1988 decision in Dallas County Commission, the Court considered the propriety of a remedial plan imposed on a county where the trial court had already found the existence of vote dilution pre-Gingles, in a county where black residents constituted a majority of the total population. See United States v. Dallas Cnty. Comm'n, 850 F.2d 1433, 1434-36 (11th Cir. 1988). However, in that case, the county's black residents formed *a minority of the voting-age population and registered-voter population*. Id. at 1434-35, 1439-40 (noting a black minority of registered voters and also noting that "there is a greater proportion of whites than blacks who are of voting age").

*aff'd in relevant part*, 985 F.2d 1471, 1485-86 (11th Cir. 1993), *abrogated on other grounds by* <u>Dillard v. Chilton County Comm'n</u>, 495 F.3d 1324, 1331-32 (11th Cir. 2007).

In summary, the Supreme Court's holding in <u>Gingles</u> compels the conclusion that a "protected class" for Section 2 purposes must include members of a racial or ethnic group who, by lacking "numerical superiority" in the relevant political subdivision, have had their votes diluted "on account of [their] race or color." See 478 U.S. at 48. Here, Plaintiffs are members of a racial group constituting a majority of the City's population *in every relevant metric*—total population, voting-age population, and registered-voter population. (See Exhibits 1 & 2). To allow a Section 2 claim to proceed under these circumstances would effectively nullify the <u>Gingles</u> Court's recognition that a vote-dilution claim depends in part on a showing that "the majority, ***by virtue of its numerical superiority***, will regularly defeat the choices of minority voters." See <u>Gingles</u>, 478 U.S. at 48 (emphasis supplied).

To the extent any other circuit has suggested otherwise, those decisions are contrary to the plain language of <u>Gingles</u> and should not be deemed persuasive. For instance, some courts have relied on the Fifth Circuit's conclusion in <u>Salas v. Sw. Tex. Jr. Coll. Dist.</u>, 964 F.2d 1542 (5th Cir. 1992) that the term "protected class" refers to members of a "national racial or language minority" group, regardless of

20

whether that group is "less populous in the district than the [racial] majority." See Salas, 955 F.2d at 1547-48; see also, e.g., Mo. State Conference of NAACP v. Ferguson-Florissant Sch. Dist., 894 F.3d 924, 933 (8th Cir. 2018) (relying on Salas and Supreme Court dictum to find vote dilution claim cognizable where nationwide racial minority comprised a "bare numerical majority" within at-large district). However, this determination is not only in conflict with the Gingles Court's "numerical superiority" holding, see 478 U.S. at 48, but is also in conflict with the Eleventh Circuit's construction of the term "protected class" in similar contexts. See, e.g., Smith, 644 F.3d at 1325 & n.15 (acknowledging that white employee was "member of a protected class" under Title VII).

For this reason, it is appropriate that other courts have rejected the Salas panel's reasoning. In Smith v. Brunswick Cnty., Va., Bd. of Supervisors, 984 F.2d 1393 (4th Cir. 1993), for example, the Fourth Circuit concluded:

> When protected voters have equal access to the polls, when they are free of undue influence in voting, and when *they represent the majority in a majority of the political unit's voting districts*, they can claim no further rights from . . . the Voting Rights Act. . . . If the voting group of blacks have the numbers necessary to win and members of the group are allowed equal access to the polls, it cannot be rationally maintained that the vote is diluted. Stated otherwise, when a racial (or language) minority becomes the voting majority in a single-member district, it is empowered with the vote in that district. . . . In summary, we hold that **when black voters have equal access to the polls and in fact represent a majority of those eligible to vote in a majority of the election districts**

21

> *relevant to the governmental body at issue, the rights afforded by . . .*
> *the Voting Rights Act[] are satisfied*.

Id. at 1400-01 (4th Cir. 1993) (emphasis supplied); *accord*, Marylanders for Fair

Representation v. Schaefer, 849 F. Supp. 1022, 1051 (D. Md. 1994); NAACP v.

Kershaw County, S.C., 838 F. Supp. 237, 240-41 (D.S.C. 1993); Jordan v. Winter,

604 F. Supp. 807, 814 (N.D. Miss. 1984) (finding that 52.83% black voting-age

population majority "is sufficient to overcome the effects of past discrimination and

racial bloc voting").

For that matter, the Fifth Circuit has itself retreated from Salas by recognizing

that Section 2 protects *local* racial and ethnic minority groups, rather than only

*nationwide* minority groups. In 2009, that court affirmed a trial judge's determination

that a county had diluted the votes of "white voters—*the minority in that county*."

See United States v. Brown, 561 F.3d 420, 424 (5th Cir. 2009) (emphasis supplied).

This holding, which plainly applies to protect "a voting group less populous *in the*

*district* than the [racial] majority," cannot be squared with the Salas court's

conclusion that Section 2 is *not* designed to protect such voters. Cf., 964 F.2d at 1548.

On the other hand, Brown is clearly more compatible with the Supreme Court's

recognition that vote-dilution claims protect only those voters who are outnumbered

in some way by one or more racial or ethnic groups in the relevant political

subdivision. See <u>Gingles</u>, 478 U.S. at 48; see also, e.g., <u>Harding v. County of Dallas, Tex.</u>, 2018 WL 1157166, at *10 (N.D. Tex. Mar. 5, 2018) (holding that Section 2 "applies to protect any minority group, including Anglo voters *when they constitute a minority*") (emphasis supplied).

In this case, Plaintiffs are members of a racial group that has attained "numerical superiority" as to the City's total population, voting-age population, and registered-voter population. Without more, Plaintiffs cannot establish that their preferred candidates are regularly defeated "by virtue of [the] numerical superiority" of other voting blocs. See <u>Gingles</u>, 478 U.S. at 48. In other words, Plaintiffs' Section 2 claims are not cognizable and must be dismissed.

### ii. *Plaintiffs Have Failed to Plausibly Allege That the City's Electoral Practices Have a Discriminatory Effect on Black Voters*

To state a viable Section 2 claim, Plaintiffs must allege "sufficient factual matter, accepted as true," to establish each of the <u>Gingles</u> preconditions to a Section 2 claim *and* to establish the existence of vote dilution under the totality of the circumstances. See <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Because Plaintiffs have failed to adequately plead facts to satisfy *any* of the <u>Gingles</u> factors, their Section 2 claims are due to be dismissed in full.

The inadequacy of Plaintiffs' pleading is most evident with respect to the second <u>Gingles</u> factor, which requires a showing that black City residents are "politically cohesive." See <u>Thornburg v. Gingles</u>, 478 U.S. 30, 51 (1986). Rather than pleading factual allegations to satisfy this precondition, Plaintiffs have instead baldly stated that "Black voters are politically cohesive" (Doc. 1 ¶ 28), without supporting this "naked assertion[]" with *any* "factual enhancement" such as voting-age population statistics, demographic statistics on election returns, trends in voting data over multiple elections, or other potentially relevant facts that might raise a right to relief above the speculative level. Plaintiffs' "formulaic recitation" of this <u>Gingles</u> factor, without any supporting factual material, is precisely the sort of allegation that the Supreme Court has deemed insufficient to state a Section 2 claim. See, e.g., <u>Iqbal</u>, 556 at 678-79.

Plaintiffs have similarly failed to allege *any* supporting factual matter concerning the third <u>Gingles</u> precondition, which requires a showing that white City residents engage in bloc voting sufficient to "usually" defeat "the minority's preferred candidate." See <u>Gingles</u>, 478 U.S. at 51. The Supreme Court has been clear: the <u>Gingles</u> test "***does not assume the existence of racial bloc voting***; plaintiffs must prove it." See <u>id</u>. at 46 (emphasis supplied). Yet, as with the second <u>Gingles</u> factor, Plaintiffs have alleged nothing in the way of factual enhancement to establish

*which* candidates are the black electorate's "preferred candidates," let alone sufficient factual material to support their bare allegations that bloc voting by white residents regularly defeats those candidates. (See Doc. 1 ¶ 28). The Court is not required to accept as true Plaintiffs' "mere legal conclusion" that this bloc voting is "usually" sufficient to result in the defeat of black City residents' preferred candidates. See, e.g., <u>Broward Citizens for Fair Districts v. Broward County</u>, 2012 WL 1110053, at *7 (S.D. Fla. Apr. 3, 2012) (citing <u>Iqbal</u>, 556 U.S. at 679).

Nor, for that matter, have Plaintiffs pleaded sufficient factual allegations to show that the first <u>Gingles</u> factor has been satisfied. Plaintiffs' "formulaic recitation" that the City's black voting-age population "is sufficiently numerous and geographically compact" to constitute a majority in one or more single-member districts (Doc. 1 ¶ 27), without more, plainly will not suffice under <u>Iqbal</u>. See, e.g., <u>Broward Citizens</u>, 2012 WL 1110053, at *5 (finding that plaintiffs' mere allegation that black voters satisfied first <u>Gingles</u> precondition "does not meet this [<u>Iqbal</u>] standard"). Although Plaintiffs point to several maps and tables attached to the complaint in apparent support of their allegation (see Doc. 1 ¶ 27), the exhibits themselves give no indication as to their provenance. (See Doc. 1 Exhs. A-C). Even assuming that one or more of these exhibits constitute the "demonstrative maps" allegedly provided to the City by Plaintiffs (Doc. 1 ¶ 50)—an assumption that is by

25

no means established by the complaint—those maps give no indication of the source(s) of population data used to create them. The mere inclusion of random maps and tables, without even a hint of the sources of data used to create those exhibits, cannot suffice to demonstrate the existence of a plausible Section 2 remedy for purposes of Gingles.

These very shortcomings—in particular the failure to adequately plead the second and third Gingles preconditions—required dismissal of the plaintiffs' complaint in Broward Citizens, 2012 WL 1110053, at *7. In that action, as in this one, the plaintiffs' complaint "contain[ed] merely a bare assertion that [minority] voters 'are politically cohesive,'" and a brief legal conclusion that the county's "White population votes sufficiently as a bloc to usually defeat the [minority] electorate's preferred candidate." See id. As the Broward Citizens court observed, the plaintiff's unadorned allegations "fail[ed] to adequately plead political cohesion on the part of [minority] voters," and failed to establish sufficient white bloc-voting, so as to satisfy the second and third Gingles factors. See id. Accordingly, as in this case, the court found that dismissal was required. See id. at *10.

The same outcome was reached in NAACP v. Snyder, 879 F. Supp. 2d 662, 674-75 (E.D. Mich. 2012). In that action, the plaintiffs alleged only that minority voters were politically cohesive, had a distinct history and culture, and had

26

"organized themselves collectively for political activity." See id. at 674. As the court held, "[e]ven at the pleading stage, in the absence of any supporting evidence, we cannot simply accept Plaintiffs' bare assertions that the area's [minority] community 'share[s] the same characteristics, needs, and interests.'" See id. The court's final statement on this appoint applies with equal force to the instant action: "Although Plaintiffs need not present us with a full factual basis to support political cohesiveness, **they are required to assert *something* beyond mere perfunctory statements.**" Id. at 674-75 (emphasis supplied); see also Woods v. Bocz, 2011 WL 4368831, at *5 (E.D. La. Sept. 19, 2011) (holding that "generic allegations" of vote dilution "fail to pass muster under Twombly and Iqbal").

In the absence of anything more than a "formulaic recitation" of the Gingles factors, the *entire* basis for Plaintiffs' discriminatory-effects claim appears to be their allegation that black City Council candidates have not successfully attained office in the two recent election cycles in which black candidates have run. (Doc. 1 ¶¶ 21, 30-31). However, "[t]he circumstance that a group does not win elections does not resolve the issue of vote dilution." League of United Latin Am. Citizens v. Perry ["LULAC"], 548 U.S. 399, 428 (2006). The very text of Section 2 provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301(b);

see also U.S. v. Marengo County Comm'n, 731 F.2d 1546, 1564 (11th Cir. 1984) ("[A]t-large elections are not prohibited per se, nor does a lack of proportional representation automatically require a finding of a violation."). As the Supreme Court has recognized, "the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." LULAC, 548 U.S. at 428 (quoting Johnson v. De Grandy, 512 U.S. 997, 1014 n.11 (1994)). Put another way, just as "minority candidates' *success* at the polls is not conclusive proof of minority voters' access to the political process," Johnson, 512 U.S. 997, 1014 n.11 (1994) (emphasis supplied), nor do minority candidates' *losses* in two election cycles constitute *per se* evidence of either black political cohesiveness or white bloc voting.

The shortcomings in Plaintiffs' pleading are only further highlighted by the fact that black City residents constitute a majority of the City's total population, a majority of the City's voting-age population, and a majority of the City's registered voters. (See Exhibits 1 and 2). Even assuming that a Section 2 claim could possibly be viable under these circumstances, a plaintiff pursuing such a claim "faces an ***obvious, difficult burden*** in proving that their inability to elect [in an at-large system] results from white bloc voting." See Salas v. Sw. Tex. Jr. Coll. Dist., 955 F.2d 1542, 1555 (5th Cir. 1992) (emphasis supplied). A plaintiff might theoretically overcome this "obvious, difficult burden" by introducing evidence that the racial group's majority

28

status is "illusory," such as evidence of inadequate absentee voting procedures or low voter turnout. See id. at 1555-56. Here, however, Plaintiffs have alleged no additional facts concerning any such modern-day impediments to black City residents seeking to vote. In other words, Plaintiffs' majority-population status only further reduces the plausibility of their claims.

The Iqbal standards are clear: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim, and dismissal is required "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Iqbal, 556 U.S. at 678-79. Here, Plaintiffs essentially assert that vote dilution must exist simply because black candidates have lost a handful of City Council elections, under circumstances not described in the complaint and not comparable to the present day, without providing any additional factual allegations to support the conclusion that such losses may be attributed to vote dilution. Without more, the Court cannot "draw the reasonable inference that the defendant is liable for the misconduct alleged." See id. at 678. Consequently, Plaintiffs' Section 2 claims must be dismissed.[11]

---

[11]The fact that Plaintiffs alternatively plead that the City acted with the "purpose of diluting of [*sic*] the strength of Black voters" (Doc. 1 ¶ 58) does not change this analysis. Even where a plaintiff alleges discriminatory intent, such a pleading, "*in the absence of a showing of discriminatory effect*, is *insufficient* to establish a violation of § 2." Brooks v. Miller, 158 F.3d 1230, 1237 (11th Cir. 1998) (citing Johnson v. DeSoto Cnty. Bd. of Comm'rs, 72 F.3d 1556, 1561 (11th Cir. 1996)) (emphasis supplied). In other words, Plaintiffs' failure to properly plead a discriminatory

## B.   <u>Plaintiffs' Constitutional Claims Are Due to be Dismissed</u>

In addition to asserting claims under Section 2 of the Voting Rights Act, Plaintiffs have alleged that the City's numbered-place at-large elections violate the Fourteenth and Fifteenth Amendments to the United States Constitution. (Doc. 1 ¶ 58). These claims, too, are due to be dismissed.

### i.   *Plaintiffs' Fifteenth Amendment Claims*

As an initial matter, vote-dilution claims are simply not cognizable under the Fifteenth Amendment. Neither the Eleventh Circuit nor the Supreme Court has ever "held or even suggested that vote dilution violates the Fifteenth Amendment." <u>Osburn v. Cox</u>, 369 F.3d 1283, 1288 (11th Cir. 2004); see also <u>Reno v. Bossier Parish Sch. Bd.</u>, 528 U.S. 320, 334 n.3 (2000) (observing that the Court has "never held that vote dilution violates the Fifteenth Amendment," that "we have never even 'suggested' as much," and that precedent in fact "suggests the opposite"); cf., <u>Voinovich v. Quilter</u>, 507 U.S. 146, 159 (1993) (recognizing that the Court "never ha[s] held any legislative apportionment inconsistent with the Fifteenth Amendment"). Rather, the Fifteenth Amendment's reach is limited *solely* to protection of "the right to register and to

---

*result* forecloses a Section 2 claim of discriminatory *intent*. See <u>id.</u>; see also <u>Ga. State Conference of NAACP v. State</u>, 269 F. Supp. 3d 1266, 1278-79 (N.D. Ga. 2017) (quoting <u>Johnson</u>, 72 F.3d at 1563) ("Section 2 'expressly requires a showing of discriminatory results, and it admits of *no exception* for situations in which there is discriminatory intent but no discriminatory results.'").

vote." Osburn, 369 F.3d at 1288. As such, Fifteenth Amendment vote-dilution claims, such as the one at issue here, are due to be dismissed as a matter of course. See Osburn, 369 F.3d at 1288 (holding that plaintiffs' Fifteenth Amendment vote dilution claim failed on face of the complaint); Lowery v. Deal, 850 F. Supp. 2d 1326, 1331 (N.D. Ga. 2012) (dismissing claim because "neither the Supreme Court nor the Eleventh Circuit currently recognizes vote dilution as a cognizable claim under the Fifteenth Amendment"), *aff'd on other grounds*, 506 F. App'x 885 (11th Cir. 2013); Thompson v. Glades Cnty. Bd. of Cnty. Comm'rs, 2004 WL 5616892, at *4, *20 (M.D. Fla. Aug. 27, 2004) ("The Eleventh Circuit does not recognize a vote dilution claim under the Fifteenth Amendment."), *aff'd*, 532 F.3d 1179 (11th Cir. 2008) (per curiam).

### ii.    *Plaintiffs' Fourteenth Amendment Claims*

The Eleventh Circuit does recognize the existence of vote-dilution claims under the Equal Protection Clause of the Fourteenth Amendment.[12] See, e.g., Johnson v. DeSoto Cty. Bd. of Comm'rs, 204 F.3d 1335, 1344-45 (11th Cir. 2000). However, to state such a claim, a plaintiff must establish that "(1) the [City]'s black population

---

[12]Though Plaintiffs do not specifically couch their Fourteenth Amendment claim in the Equal Protection Clause, nor do they allege the existence of any constitutionally inadequate process so as to state a Due Process claim. See, e.g., Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003); cf., Broward Citizens for Fair Districts v. Broward County, 2012 WL 1110053, at 10 (S.D. Fla. Apr. 3, 2012). Defendants therefore assume that Plaintiffs' Fourteenth Amendment claim is limited to a purported violation of the Equal Protection Clause, as is typically the case in vote-dilution actions.

lacks an equal opportunity to participate in the political process and elect candidates of its choice; (2) this inequality of opportunity results from the [City]'s at-large voting scheme; and (3) a racially discriminatory purpose underlies the [City]'s voting scheme." See id. at 1345 (citing Lucas v. Townsend, 967 F.2d 549, 551 (11th Cir. 1992)). Put another way, a Fourteenth Amendment vote-dilution plaintiff must show both discriminatory intent *and* that this intent caused a *discriminatory result*. See id. at 1345 & n.20; see also Lowery, 850 F. Supp. 2d at 1331.

However, because "[S]ection 2 was intended to be more permissive than the constitutional standard," a plaintiff who has failed to establish a Section 2 violation cannot state a Fourteenth Amendment vote-dilution claim. See Johnson, 204 F.3d at 1344; see also Ga. State Conference of NAACP v. State, 269 F. Supp. 3d 1266, 1281 (N.D. Ga. 2017) ("[I]f the Gingles preconditions cannot be shown, neither can the causation requirement necessary for a Fourteenth Amendment claim under the law of this circuit."). For the reasons previously stated, Plaintiffs have failed to allege sufficient factual material to satisfy the Gingles preconditions. Because Plaintiffs have therefore failed to plausibly allege that the votes of the City's black-majority voting-age and registered-voter populations are being diluted, they have not plausibly stated a constitutional vote-dilution claim. See Johnson, 204 F.3d at 1344; see also Ga. State Conference, 269 F. Supp. 3d at 1281; Broward Citizens for Fair Districts

v. Broward County, 2012 WL 1110053, at *9 (S.D. Fla. Apr. 3, 2012) ("Because the Court has already determined that Plaintiffs have failed to establish the Gingles factors . . ., the Court also finds that Plaintiffs have failed to establish the discriminatory impact necessary to substantiate an Equal Protection claim.").

Plaintiffs' Fourteenth Amendment claim also fails for another reason. In order to show causation for Fourteenth Amendment purposes, "a plaintiff must establish that 'an alternative election scheme exists that would provide ***better*** access to the political process.'" Johnson, 204 F.3d at 1346 (quoting Burton v. City of Belle Glade, 178 F.3d 1175, 1199 (11th Cir. 1999)) (emphasis supplied). "Without such a showing, the challenged voting practice is not responsible for—that is, did not cause—the plaintiffs' injury." See Dillard v. Baldwin County Comm'n, 222 F. Supp. 2d 1283, 1287 (M.D. Ala. Sept. 3, 2002).

In this case, the allegations of the complaint do not establish that a single-member district system would provide the City's black voters with "better access to the political process" than the City's current numbered-place system. Because the City's black residents already comprise a majority of the City's voting-age and registered-voter populations, and because Plaintiffs have alleged no barriers impeding their access to the polls, the City's at-large elections provide the City's black electorate with the opportunity to choose the *entirety* of the City's elected leadership

through at-large elections. By contrast, even if a single-member district system featuring several black-majority districts could perhaps guarantee the success of minority candidates *in those districts*, that system would effectively *reduce* the black electorate's "access to the political process" in the City *as a whole*, by giving black voters a decisive say in only a fraction of the City's elected leadership. Cf., Johnson, 512 U.S. at 1014 n.11 (quotation omitted) (distinguishing between "minority candidates' success at the polls" and "minority voters' access to the political process" for Section 2 purposes). Without any additional allegations showing that black voters presently have limited "access to the political process," Plaintiffs cannot establish a plausible Fourteenth Amendment claim.

## C.   The Official-Capacity Defendants Are Due To Be Dismissed

### i.   *Claims Against the Official-Capacity Defendants Must Be Dismissed as Needlessly Duplicative*

In addition to pursuing their claims against the City itself, Plaintiffs have named the current City Council members and mayor as Defendants in their official capacities. However, in the Eleventh Circuit, a suit against a public employee in his or her official capacity "is simply 'another way of pleading an action against an entity of which an officer is an agent.'" Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (quotation omitted). "Because suits against a municipal officer sued in his

official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials because local government units can be sued directly." Id.

Under the Busby rule, when a suit names both a city and its officials as defendants, the "official-capacity claims against municipal officers should be dismissed, as keeping the claims against both the municipality and the officers would be redundant." See Higdon v.Fulton County, Ga., 746 F. App'x 796, 799 (2018) (citing Busby, 931 F.2d at 776); see also, e.g., McElroy v. City of Birmingham, Ala., 903 F. Supp. 2d 1228, 1242 (N.D. Ala. 2012) (quoting Busby, 931 F.2d at 776) ("When suit is also filed against the local government entity, the court should dismiss the individual defendant in his official capacity as 'redundant and possibly confusing to the [factfinder.'").

The reasoning of Busby and Higdon applies unambiguously to § 1983 claims, including Plaintiffs' constitutional claims against the official-capacity Defendants in this action. See, e.g., Higdon, 746 F. App'x at 799; King v. Lumpkin, 545 F. App'x 799, 803 (11th Cir. 2013); Lewis v. Bentley, 2:16-cv-690-RDP, 2017 WL 432464, at *3 (N.D. Ala. Feb. 1, 2017), rev'd on other grounds, 896 F.3d 1282 (11th Cir. 2018), reh'g en banc granted, ___ F.3d ___, 2019 WL 364173 (11th Cir. Jan. 30, 2019); Smith v. Montgomery Police Dep't, 2016 WL 11440446, at *3 (M.D. Ala. Oct.

27, 2016), *R&R adopted in relevant part*, 2016 WL 7424489, at 1-2 & n.2 (M.D. Ala. Dec. 23, 2016); <u>Cook v. Randolph County, Ga.</u>, 2008 WL 11441687, at *5 n.8 (M.D. Ga. Jan. 4, 2008), *aff'd*, 573 F.3d 1143 (11th Cir. 2009); <u>Holley v. City of Roanoke</u>, 162 F. Supp. 2d 1335, 1341 n.2 (M.D. Ala. 2001).

Additionally, because the City is named as a Defendant, the <u>Busby</u> rule requires dismissal of Plaintiffs' Voting Rights Act claims against the official-capacity Defendants. See, e.g., <u>Lewis</u>, 2017 WL 432464, at *3 (dismissing official-capacity Section 2 claim and constitutional claims against mayor as duplicative of claims against city); <u>Perez-Santiago v. Volusia County</u>, 2009 WL 2602461, at *2 (M.D. Fla. Aug. 25, 2009) (dismissing Section 5 and constitutional claims against county official and county department); <u>Kennedy v. Avondale Estates, Ga.</u>, 414 F. Supp. 2d 1184, 1196 (N.D. Ga. 2005) (same as to Section 5 claims against other city officials); <u>Baines v. Masiello</u>, 288 F. Supp. 2d 376, 384-85 (W.D.N.Y. 2003) (citing, e.g., <u>Busby</u>, 931 F.2d at 766).

### ii.    *The Official-Capacity Defendants Are Absolutely Immune from Any Constitutional Claims*

Plaintiffs' official-capacity § 1983 claims are also due to be dismissed for a second reason. "Local legislators are entitled to <u>absolute</u> immunity from suit under section 1983 for actions taken in their legislative capacities." <u>Holley v. City of</u>

Roanoke, 162 F. Supp. 2d 1335, 1342 (M.D. Ala. 2001) (citing Bogan v. Scott-Harris, 523 U.S. 44, 49 (1998)) (emphasis supplied). Put succinctly, legislative immunity applies to defendants "'acting within their legislative roles,' performing 'legislative acts.'" Woods v. Gamel, 132 F.3d 1417, 1419 (11th Cir. 1998). This immunity extends not only to individual-capacity claims seeking damages or injunctive relief, but also "protect[s] [officials] from a suit challenging their actions taken in their *official* legislative capacities and seeking declaratory or injunctive relief." Scott v. Taylor, 405 F.3d 1251, 1254 (11th Cir. 2005) (emphasis supplied).

The availability of absolute legislative immunity from suit depends on the "nature of the act" being challenged. See, e.g., Holley, 162 F. Supp. 2d at 1342 (quoting Bogan, 523 U.S. at 54). In the Eleventh Circuit, "voting . . . [is] manifestly in furtherance of legislative duties." DeSisto Coll., Inc. v. Line, 888 F.2d 755, 765 (11th Cir. 1989); see also Woods, 132 F.3d at 1420 (holding that "policymaking" acts fall under the ambit of legislative immunity). And legislative immunity specifically applies to constitutional claims against local officials for engaging in legislative acts that allegedly interfere with voting rights. See, e.g., Ellis v. Coffee Cnty. Bd. of Registrars, 981 F.2d 1185, 1190-94 (11th Cir. 1993) (granting immunity to county commissioners and county attorney as to Fourteenth Amendment claim that defendants denied residents the right to vote).

In this action, Plaintiffs have sued the City and the official-capacity Defendants for violating the Fourteenth and Fifteenth Amendments by "fail[ing] to use their authority to adopt single-member districts." (Doc. 1 ¶ 49). An Alabama city may only adopt such a system "by a majority [vote] of the membership of the council." Ala. Code § 11-43-63; see also Ala. Code § 11-43-2(d) (city council members may be elected "from wards as the council may determine"). In other words, the official-capacity Defendants' alleged "failure to enact legislation to redistrict" the City is precisely the sort of function that is subject to legislative immunity. See, e.g., Martin v. Augusta-Richmond Cnty., Ga. Comm'n, 2012 WL 5950408, at *4 (S.D. Ga. Nov. 28, 2012) (dismissing Fourteenth Amendment claim against state legislators for failing to redistrict county commission and school district).[13] Accordingly, the official-capacity Defendants are entitled to absolute immunity from Plaintiffs' § 1983 claims and are due to be dismissed.

---

[13]This reasoning applies to Plaintiffs' § 1983 claims against Mayor Brasseale to the exact same extent that it applies to those claims as to the council members, given that Plaintiffs seek to assign liability to Mayor Brasseale in his capacity as a voting member of the City Council. See Bryant v. Jones, 575 F.3d 1281, 1305 (11th Cir. 2009) (legislative immunity "extends to legislative acts performed by executive officials and other non-legislators"); Holley, 162 F. Supp. 2d at 1342 (extending legislative immunity to mayor for "presiding over the meetings of the City Council"); see also Ala. Code § 11-43-2(b) (providing that mayor of city with under 12,000 inhabitants may, in his discretion, "vote as a member of the council on any question coming to a vote").

## IV.   Conclusion

For the foregoing reasons, Plaintiffs' complaint is due to be dismissed in full. The Section 2 claim under the Voting Rights Act is inviable under these circumstances, and in any event the Plaintiffs have failed to plausibly allege a violation. The Fourteenth Amendment claim fails for the same reasons, and the Fifteenth Amendment simply does not apply to the allegations of the complaint. Finally, even if the case were to proceed, the Alabama NAACP lacks standing to bring any claim in this action, and the official-capacity Defendants are entitled to dismissal of any claims against them in view of the pendency of claims against the City.

s/ David J. Canupp
David J. Canupp

s/ J. Bradley Emmons
J. Bradley Emmons

LANIER FORD SHAVER & PAYNE, P.C.
P. O. Box 2087
2101 West Clinton Avenue,  Suite 102 (35805)
Huntsville, AL 35804
Phone: 256-535-1100 / Fax: 256-533-9322
E-mail:  djc@LanierFord.com; jbe@LanierFord.com

s/ Jon B. Terry
Jon B. Terry

s/ Jonathan David Terry
Jonathan David Terry

Bains and Terry
1813 Third Avenue North
Bessemer, Alabama 35020
Telephone 205-425-1606 / Fax: 205-426-3200
E-mail: bainsjbt@bellsouth.net
E-Mail: jdterry@bainsterry.com

Attorneys for Defendants City of Pleasant Grove,
Jerry Brasseal, William Bullion, James Crumpton,
Kenneth Hatfield, Philip Houston and Paula Johnson

## CERTIFICATE OF SERVICE

I certify that I have filed the foregoing with the Clerk of the Court using the ECF System, which will send notification of such filing to those parties of record who are registered for electronic filing, and further certify that those parties of record who are not registered for electronic filing have been served by mail by depositing a copy of the same in the United States mail, first class postage prepaid and properly addressed to them as follows:

James Uriah Blacksher
P O Box 636
Birmingham, AL 35201
205-591-7238
Fax: 866-845-4395
Email: jblacksher@ns.sympatico.ca

Catherine Meza
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th St. NW, Apt. 717
Washington, DC 20005
202-216-2727
Fax: 202-682-1312
Email: cmeza@naacpldf.org

Deuel Ross
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND INC
40 Rector Street 5th Floor
New York, NY 10006
212-965-7712
Fax: 212-226-7592
Email: dross@naacpldf.org

Leah C. Aden
John Z. Morris
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND INC
40 Rector Street 5th Floor
New York, NY 10006
212-965-2200
Fax: 212-226-7592
Email: laden@naacpldf.org
Email: zmorris@naacpldf.org

on this the 8th day of February, 2019.

s/ David J. Canupp
David J. Canupp

41