

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| THE ALABAMA STATE CONFERENCE OF THE NAACP, ERIC CALHOUN and JENNIFER FORD, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF PLEASANT GROVE, et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 2:18-cv-02056-LSC |

**REPLY BRIEF IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

Defendants respectfully submit the following reply in support of their motion to dismiss:

**A.     Plaintiffs Have Failed to State a Voting Rights Act Claim**

   *i.     Vote Dilution Cannot Exist Under These Circumstances*

Section 2 prohibits vote dilution not as an abstract concept or one tied to historical demographics; instead, it prohibits vote dilution that occurs on the basis of race — *any* race. (Doc. 15 at 16-23). For that reason, the term "protected class" (the actual phrase utilized in § 2) has been recognized to correlate not with *historical* racial "minorities," but with current racial minorities within a given community.

(Doc. 15, at 17); see also United States v. Brown, 561 F.3d 420, 424 (5th Cir. 2009) (recognizing standing of minority white voters under § 2). The Supreme Court's decision in Thornburg v. Gingles, 478 U.S. 30, 46 (1986) itself bears out that principle, explaining that vote dilution on the basis of racial classification occurs "where minority and majority voters consistently prefer different candidates, [and] the majority, ***by virtue of its numerical superiority***, will regularly defeat the choices of minority voters" through the use of "a certain electoral law, practice, or structure." Id. at 46. Plaintiffs' entire position in this case is that the Court should ignore this well-settled principle. They ask the Court to recognize that black voters can claim vote dilution even where they have achieved "numerical superiority" in the City, and are otherwise no longer a "protected class" defined by § 2 itself. See id.

Plaintiffs make this argument by effectively re-writing Gingles, claiming the Court's explication of § 2's mandatory pre-conditions "merely describ[ed] the claim before" the Court. (Doc. 21 at 21). But that assertion is manifestly incorrect. The Gingles Court actually stated that its numerical-superiority rule forms the ***entire*** "theoretical basis" for a claim of vote dilution. Gingles, 478 U.S. at 48. Plaintiffs' back-up argument is to rely upon *dicta* in League of United Latin Am. Citizens ("LULAC") v. Perry, 548 U.S. 399 (2006); they do not mention, however, that LULAC was actually decided on the basis of a racial group's *minority* share of

2

voting-age citizens. See id. at 427-29 (finding Gingles pre-conditions satisfied because "the projected results in new District 23 show that the Anglo citizen voting-age majority will often, if not always, prevent Latinos from electing the candidate of their choice in the district").

Plaintiffs go on to cite Johnson v. De Grandy, 512 U.S. 997, 1012-21 (1994). For starers, Johnson addresses proportionality of representation among various single-member districts, a topic not at issue here. Id. What is more, Johnson's holding actually was that the plaintiffs could not state a § 2 violation because their racial group "form[ed] effective voting majorities" in relevant districts. Id. at 1000. Plaintiffs' misreading of Eleventh Circuit precedent fares no better. The court in Wright v. Sumter Cnty. Bd. of Elecs. & Registration, 657 F. App'x 871 (11th Cir. 2016), did not address whether a black majority had standing to claim vote dilution, but instead reversed because the district court improperly weighed evidence and made credibility determinations at summary judgment. See id. at 872-73. Similarly, Meek v. Metro. Dade Cnty., 908 F.2d 1540 (11th Cir. 1990), only allowed a vote dilution claim to proceed after finding that Hispanic voters represented a mere 32.96% *minority* share of registered voters. Id. at 1546-47. Here, of course, the City has established that black residents represent a majority of its registered voters.

The remaining decisions cited by Plaintiffs were all decided prior to the Supreme Court's watershed decision in Gingles, and are clearly abrogated to the extent that they are inconsistent with that case. (Doc. 21 at 22-24). In any event, because those decisions were premised on findings of vote dilution for racial groups that constituted a majority only in terms of *total population*, they are distinguishable from the present case, where black voters also make up a majority of *voting-age* and *registered-voter* populations.[1]

Plaintiffs next argue that the Fifth Circuit has not retreated from its holding in Salas v. Sw. Tex. Jr. Coll. Dist., 964 F.2d, 1542 (5th Cir. 1992), by asserting that the court's subsequent decision in Brown "has nothing to do with vote dilution claims." (Doc. 21 at 29 n.6). Plaintiffs are, again, incorrect. See, e.g., Brown, 561 F.3d at 424 (affirming conclusion "that defendants indeed violated § 2 by intentionally *diluting the voting power of white Democrats*"). And Plaintiffs altogether ignore the Fourth Circuit's rejection of the Salas panel's reasoning, which is especially persuasive and longstanding. See Smith v. Brunswick Cnty., Va., Bd. of Supervisors, 984 F.2d 1393 (4th Cir. 1993).

---

[1] Plaintiffs' description of Moore v. Leflore Cnty. Bd. of Elec. Comm'rs, 502 F.2d 621 (5th Cir. 1974), is especially inaccurate. (Doc. 21 at 23-24). The passage cited by Plaintiffs dealt only with the propriety of a particular proposed districting plan; that plan was rejected precisely because it furthered dilution of black votes by creating more districts where black citizens would be in the *minority* of registered voters, despite constituting a *total-population majority* in those districts. Moore, 502 F.2d at 624. The case thus has no relevance. Regardless, Moore pre-dates Gingles.

In short, Plaintiffs have offered an unacceptable interpretation of § 2 that contradicts the statutory text as well as controlling precedent, and the decisions that they have cited do not show otherwise. But even if the question were close, the construction put forth by Plaintiffs is problematic for still other reasons. The Supreme Court has made clear that § 2 cannot be interpreted to create a right to "proportional representation" for any racial group, as such an "entitlement . . . simply is not to be found in the Constitution of the United States." City of Mobile v. Borden, 446 U.S. 55, 76 (1980). The text of § 2 reflects this recognition. 52 U.S.C. § 13101(b). Yet, the *entire* basis for Plaintiffs' § 2 claim appears to be their allegation that black City Council candidates have not successfully attained office in two recent election cycles. If mere lack of electoral success is sufficient evidence of a § 2 violation even where the relevant racial group holds the majority of electoral power within a community — as Plaintiffs unabashedly maintain — then § 2 would provide racial groups with the right to an election system that *guarantees* them racial representation in proportion to their share of the population. Indeed, § 2 itself would mandate our governments discriminate on the basis of race.

Such an argument is contrary to the plain language of § 2, and in fact turns the Voting Rights Act on its head. The "essence" of a vote dilution claim is *not* that candidates of a particular race cannot achieve an equal electoral outcome, but that an

5

"electoral law, practice, or structure interacts with social and historical conditions to *cause* an inequality in *opportunities*." Gingles, 478 U.S. at 47. If a racial group has sufficient numbers to guarantee its members the *opportunity* to elect representatives of its choosing (as is the case here), and no barrier impedes any voters *access* to the polls (as is the case here), then it is evident that the "electoral law, practice, or structure" in place did not "cause" any alleged injury. See Smith, 984 F.2d at 1400. In other words, § 2 could not possibly have been violated under those circumstances. By contrast, if the "theoretical basis" for a § 2 claim is decoupled from the question of whether the votes of one racial group are diluted by the "numerical superiority" of other racial groups, then the *only* possible metric for measuring vote dilution is "whether members of the protected group are elected." Id. This approach "violates both the letter and the spirit of the Voting Rights Act" by transforming a protection of electoral "opportunity" into a promise of electoral "success." Id.

Plaintiffs' construction of § 2 would also trigger serious Equal Protection concerns. The Supreme Court has repeatedly stressed that racial considerations cannot predominate in electoral districting decisions. See, e.g., Miller v. Johnson, 515 U.S. 900, 905 (1995) (citing Shaw v. Reno, 509 U.S. 630 (1993)). This axiom derives from the broader principle that legislation motivated by race is "presumptively invalid." See Adarand Constrs., Inc. v. Pena, 515 U.S. 200, 234 (1995). This

presumptive invalidity applies to "laws mandating that third parties"—such as "State[] or municipal" governments—"discriminate on the basis of race." See Ricci v. DeStefano, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) (citing Buchanan v. Warley, 245 U.S. 60, 78-82 (1917)). "And of course the purportedly benign motive for the [law] cannot save the statute." See id. at 595 (citing Adarand, 515 U.S. at 227).

A ruling interpreting § 2 to require that the City adopt single-member districts under these factual circumstances—where black City residents make up a majority of all relevant population metrics and have equal access to the ballot box—would be tantamount to forcing the City to adopt a new electoral system "unexplainable on grounds other than race." Miller, 515 U.S. at 905. Such a construction would steer § 2 into a headlong collision course with the Equal Protection clause, "raising serious constitutional questions." See LULAC, 548 U.S. at 446 (Kennedy, J., concurring).

The Supreme Court has scrupulously avoided deciding the constitutionality of § 2. See id.; see also Georgia v. Ashcroft, 539 U.S. 461, 491-92 (2003) (Kennedy, J., concurring); Chisom v. Roemer, 501 U.S. 380, 418 (1991) (Kennedy, J., concurring). This Court certainly should not accept a construction of § 2 that would place its constitutionality in doubt. See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988). Fortunately, the plain language

of Gingles obviates the need to address the constitutional question. Because Plaintiffs are members of a racial group that has attained "numerical superiority" in the City in all relevant metrics, they have failed to trigger the "theoretical basis" for a vote dilution claim under § 2. See Gingles, 478 U.S. at 46.

### ii.  Plaintiffs' Allegations Do Not Suffice to State a § 2 Claim Under Iqbal

Even setting aside Plaintiffs' improper interpretation of § 2, Plaintiffs' claim cannot proceed solely on their mere allegation that the City's black voters are "politically cohesive" and that white voters engage in bloc voting that "usually" defeats the "preferred candidate" of black voters. (Doc. 1 ¶ 28). Because Plaintiffs' complaint contains nothing more than "[t]hreadbare recitals" of these requirements, dismissal is required. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).[2]

The two district court cases cited by Plaintiffs (Doc. 21 at 11) actually demonstrate exactly how Plaintiffs' complaint is lacking as to the second and third elements of the Gingles analysis. In Luna v. Cnty. of Kern, 2016 WL 4679723 (E.D. Cal. Sept. 6, 2016), the complaint at issue did not conclusorily allege the existence

---

[2] Although Plaintiffs' response brief repeatedly veers off into a discussion of the "totality of the circumstances" factors (Doc. 21 at 8-9, 12), those factors are not addressed by Defendants' motion. Nor does the Court need to engage in that analysis where, as here, Plaintiffs have failed to sufficiently allege compliance with the Gingles preconditions. See Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 775 F.3d 1336, 1342 (11th Cir. 2015) (noting that Gingles factors are "threshold requirements").

of black cohesion as Plaintiffs do, but *backed up that allegation* by pleading that electoral outcomes in majority-Latino districts differed from outcomes in other districts. Id. at * 5. The plaintiffs in Lopez also *backed up their allegations* by attaching a statistical analysis of elections to their complaint. See Lopez v. Abbott, 2017 WL 1209846, at *6 (S.D. Tex. Apr. 3, 2017). Such allegations appropriately pushed the plaintiffs' allegations over "the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678.

By contrast, Plaintiffs have relied entirely on "naked assertions," without any "factual enhancement," to support their allegations of black political cohesion and white bloc voting. As in Broward Citizens for Fair Districts v. Broward Cnty., 2012 WL 1110053 (S.D. Fla. Apr. 3, 2012), Plaintiffs' complaint does not actually allege examples of cohesion or block voting, but simply asserts that such factors are present. Id. at *7 & n.8. That court's conclusions are apt: "While the Court does not conclude that Plaintiffs must present statistical evidence of political cohesion at this stage of the proceedings, *Plaintiffs must allege something beyond a conclusory allegation that [minority voters] are politically cohesive*." See id. Plaintiffs' "bare assertion" to that effect (see Doc. 1 ¶ 28) is plainly insufficient. See id. (citing Iqbal, 556 U.S. at 678); see also NAACP v. Snyder, 879 F. Supp. 2d 662, 674-75 (E.D. Mich. 2012) (dismissing claim for failure to "assert something beyond mere perfunctory

9

statements" concerning cohesion).

Plaintiffs suggest that data included on unlabeled maps somehow resolve these shortcomings. (Doc. 21 at 11). To be clear, nothing on the face of the complaint or its attached maps sets forth the source of the data included. The maps say nothing at all about bloc voting or political cohesion; they merely set out alleged racial composition of neighborhoods, something entirely irrelevant to the Iqbal analysis here. (See Doc. 15 at 25-26). Even if the maps contained voting-age population data, such data alone cannot plausibly establish either cohesion or majority-bloc voting. See Broward Citizens, 2012 WL 1110053, at *5-7 (dismissing § 2 claims pursuant to Iqbal, notwithstanding plaintiffs' details assertion of voting-age population statistics). Allegations concerning only the *size* of a racial group, without more, clearly cannot plausibly establish the *cohesion* of a racial group. See id. Courts do not indulge in the *assumption* that blacks vote for blacks and whites for whites, nor should they.

Mere allegations concerning electoral outcomes also do not "resolve the issue of vote dilution." LULAC, 548 US. at 428. Supreme Court and Eleventh Circuit precedent is clear that "minority candidates' success at the polls [or lack thereof] is not conclusive proof" of vote dilution. (Doc. 15 at 27-28) (citing, e.g., Johnson, 512 U.S. at 1014 n.11). Beyond their own *ipse dixit* (see Doc. 1 ¶¶ 28-29), Plaintiffs do

not allege *any* facts showing a relationship between electoral outcomes and black electoral opportunity, let alone sufficient facts to render their § 2 claim plausible.

Although the Court need not consider Defendants' exhibits to reach this conclusion, it bears repeating that public ACS data and registered-voter statistics attached to Defendants' motion further highlight the implausibility of their claim. (See Doc. 15 at 28); see also Greater B'ham Ministries v. Merrill, 284 F. Supp. 3d 1253, 1268 (N.D. Ala. 2018) (relying on, e.g., ACS five-year estimates). For starters, the data show that the complaint's allegation that black voters are in the minority in the City is inaccurate. And the data also suggest that losses by black candidates in two electoral cycles may well have nothing to do with the race of the candidates. At most, then, even if vote dilution could ever be pled by a numerical majority, the allegations of the complaint might be *consistent* with, but do not plausibly establish, vote dilution. See Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007) ("naked" allegations of "parallel conduct," though potentially consistent with an unlawful conspiracy, insufficient standing alone to show a conspiracy "without that further circumstance pointing toward a meeting of the minds").

### B. Plaintiffs' Constitutional Claims Remain Due to be Dismissed

#### i. Plaintiffs Have No Fifteenth Amendment Claim

In U.S. v. Marengo Cnty. Comm'n, 731 F.2d 1546, 1555 (11th Cir. 1984), the

Eleventh Circuit concluded that the Supreme Court had recognized a Fifteenth Amendment vote dilution claim in City of Mobile v. Bolden, 446 U.S. 55, 64-65 (1980). But the Court subsequently rejected that reading of Bolden. See Reno v. Bossier Parish Sch. Bd., 528 U.S. 320, 334 n.3 (2000) ("not only does [Bolden] *not* suggest that the Fifteenth Amendment covers vote dilution, it suggests the opposite").

Because Marengo's own theoretical underpinnings have now been "undermined to the point of abrogation" by a "clearly on point" Supreme Court decision, it is not controlling as to the viability of Plaintiffs' Fifteenth Amendment claim. See, e.g., United States v. Archer, 531 F.3d 1347, 1352 (11th Cir. 2008). Instead, Osburn requires dismissal of that claim. See Osburn v. Cox, 369 F.3d 1283, 1288 (11th Cir. 2004); Lowery v. Deal, 850 F. Supp. 2d 1326, 1331 (N.D. Ga. 2012).

### ii. *Plaintiffs Have Failed to Adequately Allege a Fourteenth Amendment Violation*

Plaintiffs suggest that Dillard v. Crenshaw Cnty., 640 F. Supp. 1347 (M.D. Ala. 1986) effectively constitutes *res judicata* as to their Fourteenth Amendment claim. (See Doc. 21 at 5-6, 31) (citation omitted). This is certainly not correct, given that the City was not a party to that litigation. (Doc. 1 ¶ 38). Further, Dillard expressly did *not* address constitutional claims. Dillard, 640 F. Supp. at 1352 n.1. And at least one other court has disagreed with Dillard. S. Christian L'ship Conf. v. Evans, 785 F. Supp.

1469, 1487-89 & nn.3-4 (M.D. Ala. 1992). Therefore, Dillard cannot control.

Plaintiffs also argue that "constitutional claims . . . have a more relaxed effect requirement than Section 2 does." (Doc. 21 at 34). This statement is *directly contrary* to controlling precedent. See Johnson v. DeSoto Cnty. Bd. of Comm'rs, 204 F.3d 1335, 1344 (11th Cir. 2000) ("[E]ven if the [§ 2 and Fourteenth Amendment] standards are not completely identical in application, we know that ***section 2 was intended to be more permissive than the constitutional standard.***"). Johnson suggests the *inverse* proposition: where a plaintiff *fails* to establish the first Gingles precondition to a § 2 claim, "there is no question" that he will necessarily have failed to show causation for Fourteenth Amendment purposes. (Doc. 21 at 33); see also Ga. State Conf. of NAACP v. State, 269 F. Supp. 3d 1266, 1281 (N.D. Ga. 2017).

Under the Fourteenth Amendment's more stringent requirements, Plaintiffs must allege not only the existence of "a permissible remedy" as § 2 requires, but also that the remedy "would provide [minority voters] ***better*** access to the political process" than the existing scheme. See Johnson, 204 F.3d at 1346. Plaintiffs do not directly dispute that a districting remedy that *subdivides* the City's black voting majority will necessarily *reduce* that population's access to the political processes "by giving black voters a decisive say in only a fraction of the City's elected leadership." (Doc. 15 at 34). Plaintiffs' discussion of remedies under § 2 (Doc. 21 at 15-18) is

13

insufficient to show a viable remedy under this standard.

### C. The Official-Capacity Defendants Are Not Proper Parties

Plaintiffs argue that the Eleventh Circuit has not recognized "a categorical rule" requiring dismissal of redundant official capacity claims against government officials when the government entity is also sued. (Doc. 21 at 35). On the contrary. See Higdon v. Fulton Cnty., 746 F. App'x 796, 799 (11th Cir. 2018) ("[O]fficial capacity claims against municipal officers ***should be dismissed***, as keeping the claims against both the municipality and the officers would be redundant."). Lake Park, which improperly premised its holding on another decision's *factual* statement of the case (rather than any *legal* conclusion about capacity for suit), does not control. See United States v. Town of Lake Park, 2009 WL 3667071, at *4 (S.D. Fla. Oct. 23, 2009) (citing James v. City of Sarasota, 611 F. Supp. 25 (M.D. Fla. 1985)).

Plaintiffs refusal to recognize the individual Defendants' entitlement to legislative immunity is premised on its reading of Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 677 (1996). The Eleventh Circuit has cast doubt on the "single unexplained sentence in [Umbehr]" cited by Plaintiffs, suggesting that the language in question has been superseded by subsequent Supreme Court authority. See Scott v. Taylor, 405 F.3d 1251, 1255 n.6 (11th Cir. 2005) (citing Bogan v. Scott-Harris, 523 U.S. 44 (1998)). Accordingly, courts have recognized that legislative immunity

continues to extend to local government officials sued in their official capacity. See, e.g., Jones v. Ward, 2011 WL 1187807, at *11-12 (M.D. Ala. Mar. 30, 2011) (dismissing individual- *and official-capacity claims* brought against county commissioner under doctrine of legislative immunity).

Finally, Plaintiffs' curious insistence that they "are not asking this Court to order Defendants to pass an ordinance changing the method of election to single-member districts," and therefore are not seeking to impose liability on Defendants for legislative action or inaction (Doc. 21 at 38-40), is directly contradicted by the complaint. (Doc. 1 ¶ 60(c)) (praying that this Court "[o]rder[] the City to adopt single-member districts or another new method of election"). Plaintiffs' protestations that they have only sued the Defendants in their capacity as "administrators" of elections is transparently inaccurate as well: there are no allegations that Defendants have improperly "administered" elections, only that the City's legislatively-adopted electoral system is flawed.

For the foregoing reasons, Defendants respectfully request that the court grant their motion to dismiss the complaint in this case.

s/ David J. Canupp
David J. Canupp

s/ J. Bradley Emmons
J. Bradley Emmons

LANIER FORD SHAVER & PAYNE, P.C.
P. O. Box 2087
2101 West Clinton Avenue, Suite 102 (35805)
Huntsville, AL 35804
Phone: 256-535-1100 / Fax: 256-533-9322
E-mail: djc@LanierFord.com; jbe@LanierFord.com

                                                                s/ Jon B. Terry
                                                                 Jon B. Terry

                                                                 s/ Jonathan David Terry
                                                                 Jonathan David Terry

Bains and Terry
1813 Third Avenue North
Bessemer, Alabama 35020
Telephone 205-425-1606 / Fax: 205-426-3200
E-mail: bainsjbt@bellsouth.net
E-Mail: jdterry@bainsterry.com

Attorneys for Defendants City of Pleasant Grove,
Jerry Brasseal, William Bullion, James Crumpton,
Kenneth Hatfield, Philip Houston and Paula Johnson

CERTIFICATE OF SERVICE

      I certify that I have filed the foregoing with the Clerk of the Court using the ECF System, which will send notification of such filing to those parties of record who are registered for electronic filing, and further certify that those parties of record who are not registered for electronic filing have been served by mail by depositing a copy of the same in the United States mail, first class postage prepaid and properly addressed to them as follows:

James Uriah Blacksher
P O Box 636
Birmingham, AL 35201
205-591-7238
Fax: 866-845-4395
Email: jblacksher@ns.sympatico.ca

Catherine Meza
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th St. NW, Apt. 717
Washington, DC 20005
202-216-2727
Fax: 202-682-1312
Email: cmeza@naacpldf.org

Deuel Ross
Leah C. Aden
John Z. Morris
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND INC
40 Rector Street 5th Floor
New York, NY 10006
212-965-2200
Fax: 212-226-7592
Email: dross@naacpldf.org
Email: laden@naacpldf.org
Email: zmorris@naacpldf.org

on this the 28th day of February, 2019.

                                            s/ David J. Canupp
                                            David J. Canupp